87 F.3d 1325
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Reed WINSLOW, Defendant-Appellant.
 No. 95-30115.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 9, 1996.
Decided June 19, 1996.
 
 1
 Before: PREGERSON and TASHIMA, Circuit Judges, and JONES, District Judge.*
 
 
 2
 MEMORANDUM**
 
 
 3
 A jury convicted appellant Reed Winslow ("Winslow") of distribution of cocaine and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). On his first appeal, Winslow contended, inter alia, that the prosecution's failure to provide him with the entirety of a videotape made during the "sting" operation in this case violated Brady v. Maryland, 372 U.S. 83, 87 (1963). A panel of this court affirmed the conviction on all other issues but remanded the case to the district court to conduct a Brady hearing and to consider the issue of cumulative error. United States v. Winslow, No. 93-30379 memo. (9th Cir. Nov. 1, 1994) ("Winslow I "). On remand, the district court found no Brady violation and no cumulative error.
 
 
 4
 Winslow now appeals from that ruling. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 5
 On December 20, 1992, King County police conducted a "sting" out of the apartment of informant Michael Campbell ("Campbell"). In return for not being charged with simple cocaine possession, Campbell agreed to set up Winslow, his alleged source.
 
 
 6
 Police videotaping equipment set up in the apartment captured a meeting between Winslow and Campbell. Winslow discussed money Campbell owed him, whether Campbell was dealing with an undercover cop, and the purity of Winslow's "stuff." They exchanged no money or drugs. The meeting ended when Winslow left the apartment.
 
 
 7
 Officers then allowed Campbell to leave, unsurveilled, and drive to the neighboring town of Kent, Washington. Campbell testified at trial that he met Winslow in Kent and obtained six ounces of cocaine. Winslow allegedly instructed Campbell to come back later to Kent with payment. After returning to his apartment, Campbell delivered to police the cocaine he claimed to have received from Winslow. Police then followed Campbell back to Kent, where they arrested Winslow as he was waiting in his car.
 
 
 8
 With information that Campbell provided to them, police executed a search warrant at two apartments, seizing large amounts of cash and drugs. At trial, the government linked Winslow to both apartments with papers and photos found on the premises. A police officer testified that the 417.3 ounces of cocaine recovered from one apartment was distinctively packaged just like the cocaine Campbell testified Winslow gave him.
 
 
 9
 At trial, the videotape shot in Campbell's apartment was played, up to the point where Winslow leaves. The copy of the videotape given to the defense in pre-trial discovery contains only this portion. However, the original videotape continues on after Winslow leaves: Campbell speaks on the phone and to the camera, leaves the apartment, returns with the drugs after the lapse of several minutes, discusses the deal with police on the phone, and tells them to "come up and check it out."
 
 
 10
 The jury, which viewed a nondisclosed portion of the videotape during deliberations, returned a guilty verdict.
 
 
 11
 The tape runs for eight minutes and 40 seconds between the point where Campbell leaves his apartment on his way to the meeting with Winslow and the point where Campbell returns after the alleged drug deal. Winslow argued that this portion of the tape withheld from him is material and exculpatory because it shows Campbell was gone from his apartment for too little time to have done the drug deal with Winslow in Kent as he testified.
 
 
 12
 Detective Chang testified for the government on remand that he paused the videotaping some time after Campbell left and reactivated it when notified that Campbell was coming back to the apartment. This testimony was corroborated by the report Chang prepared the day following the taping, which was provided to Winslow in pre-trial discovery. It reflects 28 minutes of pauses in the taping. Two other officers also testified they saw Chang pause the videotape while Campbell was away.
 
 
 13
 There are also four more minutes of action recorded on the original videotape after Campbell arrives home following the alleged deal. On remand, Winslow also advanced theories as to why nondisclosure of this part of the tape violated Brady.
 
 
 14
 In its Findings of Fact and Conclusions of Law on remand, the trial court found that police paused the tape during Campbell's absence. It concluded that: (1) the remainder of the video recording not provided to Winslow contains no material, exculpatory evidence; and (2) there was no cumulative error.
 
 DISCUSSION
 A. Brady violation
 
 15
 Winslow contends the Brady violation requires reversal of his conviction. He advances five theories of why the portion of the videotape not provided to him contains material, exculpatory information.
 
 
 16
 We review claims of Brady violations de novo. United States v. Aichele, 941 F.2d 761, 764 (9th Cir.1991).[1] Evidence is material under Brady if there is a reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceedings would have been different. United States v. Bagley, 473 U.S. 667, 682 (1985). Bagley held that a reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. Id. at 678.
 
 
 17
 We view Winslow's materiality arguments against a backdrop of the other evidence of guilt. That evidence, besides Campbell's testimony supporting Winslow's conviction, includes: (1) the taped discussions of Winslow and Campbell; (2) the drugs seized at the two apartments linked to Winslow; and (3) the similar packaging of these drugs and the drugs Campbell allegedly bought from Winslow.
 
 
 18
 1. The brevity of Campbell's absence.
 
 
 19
 On the face of the videotape, it appears Campbell was gone only for eight minutes and 40 seconds--undisputedly too little time to have travelled to Kent to conduct a drug deal. Winslow claims a Brady violation occurred because failure to provide him with the remaining portion of the tape prevented him from arguing to the jury that the transaction could not have taken place as Campbell testified.
 
 
 20
 Winslow disputes the government's explanation for the discrepancy--the 28-minute pause. Winslow argues that, at the very least, he could have cast a reasonable doubt in the minds of jurors on the police's explanation of the brief interlude on the face of the tape.[2]
 
 
 21
 We reject Winslow's argument. There is no reasonable probability the jury would have credited this particular defense, had Winslow an opportunity to make it. The government's explanation of a pause is uncontradicted and compelling. Detective Chang's report, written the day after the taping, clearly reflects a pause of 28 minutes. On remand, two officers corroborated Chang's testimony that he paused the tape. We find the eight-minute, 40-second portion of tape was not material, exculpatory evidence.
 
 
 22
 2. The "stash" theory.
 
 
 23
 Winslow speculates that Campbell obtained the cocaine from a secret stash, not from Winslow. The nondisclosed portion of the tape shows Campbell arriving back at the apartment with the cocaine, not delivering it to police in the parking lot, as Winslow characterizes police trial testimony to have been. Winslow argues that the jury was unable to consider a "secret stash" theory, because the defense was unaware of corroboration from the tape.
 
 
 24
 Winslow's theory is neither supported by the record nor material. Winslow misconstrues Detective Jorgensen's testimony as being that he and Campbell met in the parking lot. In fact, Jorgensen's testimony was that Campbell called him in the parking lot, and he went up to meet Campbell in his apartment. Thus, there is no discrepancy between police testimony and the tape. Even if there were such a discrepancy, the tape does not make a "secret stash" theory any more probable. Campbell could have gotten drugs from a secret stash whether he delivered the drugs to police in the parking lot or in the apartment.
 
 
 25
 3. Contradiction of government witnesses.
 
 
 26
 Winslow next argues the undisclosed videotape reveals valuable material that he could have used to impeach the credibility of Campbell and Jorgensen.
 
 
 27
 First, the video shows Campbell on the phone with police after the alleged drug deal claiming that Winslow had threatened his life. At trial, Campbell downplayed the threat, saying Winslow just told him that he knew where Campbell's sister lived. Winslow argues that this discrepancy impeaches Campbell's credibility. However, this discrepancy is on a matter so collateral that it does not undermine confidence in the verdict.
 
 
 28
 Second, the video shows Campbell, upon his return to the apartment, setting the cocaine out on a table in the absence of police. Winslow argues that this action impeaches: (1) Jorgensen's testimony that he met Campbell in the parking lot and went up to the apartment with Campbell; and (2) Campbell's testimony that when he returned from the deal to his apartment, police were waiting inside.
 
 
 29
 We reject this argument. Winslow misconstrues Jorgensen's testimony, which is consistent with the events on tape. We also find that any discrepancy between the tape and Campbell's testimony is immaterial.
 
 
 30
 4. "Gilta" as the source.
 
 
 31
 In an argument not raised on remand, Winslow speculates that Campbell in fact received his drugs from a woman named "Gilta." During a phone call on the undisclosed portion of the videotape, Campbell mentions Gilta as a person he needs to pay.
 
 
 32
 As a general rule, one may not urge as a ground for reversal a theory not presented to the trial court. United States v. Reyes, 8 F.3d 1379, 1390 (9th Cir.1993). Because Winslow raises this theory for the first time on his second appeal, and no exception to the general rule of waiver applies,[3] we decline to consider it.[4]
 
 
 33
 5. Missing end-portion.
 
 
 34
 Winslow's last theory of materiality is that some 26 minutes of action that should be at the end of the original videotape are mysteriously missing, undermining the videotape's probative value.
 
 
 35
 Detective Chang's notes indicate he reactivated the taping equipment upon Campbell's return, and deactivated the equipment once again 30 minutes later. However, the original videotape played at trial goes blank only four minutes after Campbell returned. The government has not offered an explanation for why the tape ends where it does although the equipment supposedly continued operating for another 26 minutes.
 
 
 36
 Winslow has indeed found here a loose end in the government's case, but the loose end is not material. What the tape might have shown, why it is incomplete, and what the jury might have made of it, all are questions that call for pure speculation. Winslow's missing-tape theory does not undermine confidence in the verdict.
 
 
 37
 Finally, we also find that no Brady violation resulted from the cumulative effect of all of Winslow's five theories as to why the undisclosed portion of the videotape was material.
 
 B. Cumulative error
 
 38
 Winslow challenges the district court's conclusion of law that no prejudicial cumulative error arose from the various errors that occurred at trial.
 
 
 39
 On Winslow's first appeal, the panel either found or assumed three errors. Winslow I, at 2, 5.[5] Each error, considered individually, was found harmless. However, the panel stated in a footnote:
 
 
 40
 In considering the effect of any Brady violation upon the trial, the district court should also consider whether that violation, together with the other errors, amounted to prejudicial cumulative error, even though no error taken alone would demand a new trial.... We leave the issue of cumulative error for the district court to decide after it has held the Brady hearing.
 
 
 41
 Winslow I, at 4 n. 1.
 
 
 42
 The first panel implicitly found that no cumulative error arose solely from the three errors it had already found harmless individually. The panel would never have wasted the time of the parties, the district court on remand, and now the subsequent panel, had it considered those three errors cumulatively to be sufficiently prejudicial to require reversal. Accordingly, the first panel contemplated cumulative error analysis only if a Brady violation was found. No Brady violation occurred. Therefore, we need not further review the district court's conclusion that there was no cumulative error.
 
 
 43
 Both the judgment and the Findings of Fact and Conclusions of Law on remand are AFFIRMED.
 
 
 
 *
 The Honorable Robert E. Jones, United States District Judge, District of Oregon, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 After a remand hearing on Brady issues, the same de novo standard of review applies to the district court's findings on materiality. See United States v. Lehman, 792 F.2d 899, 901 (9th Cir.), cert. denied, 479 U.S. 868 (1986)
 
 
 [2]
 Winslow notes the government has offered no explanation for why conservation of space on the videotape was important, nor for the absence of a routinely-used time/date counter or of a contemporaneous audio announcement that the tape was being paused
 
 
 [3]
 The exceptions to the rule are: (1) when review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process; (2) when a change in law raises a new issue while an appeal is pending; and (3) when the issue is purely one of law. Reyes, 8 F.3d at 1390
 
 
 [4]
 Moreover, the Gilta theory is a slim reed on which to base a Brady claim. Reference to Gilta is mixed in with references that are undisputedly to Winslow. Campbell's remarks imply Gilta is Winslow's affiliate, so her involvement is not exculpatory
 
 
 [5]
 These errors included: (1) presentation of extrinsic evidence from the videotape to the jury during deliberations; (2) the exclusion of Winslow during this playing of the tape; and (3) an inadvertent jury instruction regarding the guilty plea of Winslow's codefendant